# United States Court of Appeals for the Federal Circuit

---

**STARKIST CO.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2021-1548

---

Appeal from the United States Court of International Trade in No. 1:14-cv-00068-TMR, Judge Timothy M. Reif.

---

Decided: March 30, 2022

---

MICHAEL EDWARD ROLL, Roll & Harris LLP, Los Angeles, CA, argued for plaintiff-appellant. Also represented by BRETT IAN HARRIS, Washington, DC.

ALEXANDER J. VANDERWEIDE, Civil Division, Commercial Litigation Branch, United States Department of Justice, New York, NY, argued for defendant-appellee. Also represented by BRIAN M. BOYNTON, JEANNE DAVIDSON, JUSTIN REINHART MILLER; SHERYL FRENCH, Office of Assistant Chief Counsel, International Trade Litigation, United States Customs and Border Protection, New York, NY.

---

Before MOORE, *Chief Judge*, DYK and REYNA, *Circuit Judges*.

REYNA, *Circuit Judge*.

StarKist Co. challenges a tariff classification of four imported tuna salad products under subheading 1604.14.10 of the Harmonized Tariff Schedule of the United States. We affirm.

## HTSUS

The cross-border movement of goods across international markets is regulated by tariff classification systems for ascribing the appropriate tariff to specific imported goods. In the United States, the Harmonized Tariff Schedule of the United States ("HTSUS") governs the classification of imported goods and merchandise and provides the applicable tariff rates. The HTSUS and the Additional U.S. Notes to the HTSUS have the force of statutory law. *Aves. In Leather, Inc. v. United States*, 423 F.3d 1326, 1333 (Fed. Cir. 2005); USITC Pub. 4368, at Preface p. 1 (2013).

The interpretation of HTSUS provisions is undertaken through General Rules of Interpretation ("GRIs") and the Additional U.S. Rules of Interpretation ("ARIs"). *BASF Corp. v. United States*, 482 F.3d 1324, 1325–26 (Fed. Cir. 2007). Absent contrary legislative intent, we construe HTSUS terms according to their common and commercial meanings, which we presume to be the same. *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999).

The application of the GRIs and ARIs is rigid. The GRIs are to be applied in numerical order, such that, if proper classification is achieved through a particular GRI, the remaining successive GRIs should not be considered. *Id.* GRI 1 explains that classification under any heading shall be determined according to the terms of the headings and any relative section or chapter notes. Once the court determines the appropriate heading, the court applies GRI 6 to determine the appropriate subheading. *See*

*Orlando Food Corp. v. United States*, 140 F.3d 1437, 1439 (Fed. Cir. 1998). GRI 6 provides that "the classification of goods in the subheadings of a heading shall be determined according to the terms of those subheadings and any related subheading notes and, *mutatis mutandis*, to the above rules." Accordingly, where a party disputes a classification under a particular subheading, we apply GRI 1 as a substantive rule of interpretation, such that when an imported article is described in whole by a single classification subheading, then that single classification applies, and the successive GRIs are inoperative. *CamelBak Prods., LLC v. United States*, 649 F.3d 1361, 1364 (Fed. Cir. 2011).

## BACKGROUND

This appeal involves two varieties of tuna salad products, albacore and chunk light, each of which is imported as ready-to-eat pouches or lunch-to-go kits. J.A. 2. The lunch-to-go kits consist of the tuna salad pouches, crackers, a mint, a napkin, and a spoon. J.A. 3.

The administrative record demonstrates that the production processes for both types of tuna salad products are the same in all ways relevant to this appeal. The fish is caught in South American or international waters, frozen, delivered to a facility in Ecuador, sorted, thawed, cooked, machine chopped, then hand-folded with a prepared mixture of other ingredients including a mayo base comprising more than 12% soybean oil. J.A. 3–4, 45–53, 55–56, 60–61. The resulting mixture is packaged into pouches using metal funnels. J.A. 4, 45, 56, 60–61.

The tuna salad products at issue have been classified by United States Customs and Border Protection

("Customs") under subheading 1604.14.10.  Heading 1604 provides:

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | General | Special | 2 |
| 1604 (con.) | | Prepared or preserved fish; caviar and caviar substitutes prepared from fish eggs: (con.) Fish, whole or in pieces, but not minced: (con.) | | | | |
| 1604.13 | | Sardines, sardinella and brisling or sprats: In oil, in airtight containers: | | | | |
| 1604.13.10 | 00 | Smoked sardines, neither skinned nor boned, valued $1 or more per kg in tin- plate containers, or $1.10 or more per kg in other containers... kg... | | Free | | 30% |
| | | Other: | | | | |
| 1604.13.20 | 00 | Neither skinned nor boned... kg... | | 15% | Free (A+, AU, BH, CA, CL, CO, D, E, IL, JO, MA, MX, OM, P, PA, PE, SG) 1.5% (KR) | 30% |
| 1604.13.30 | 00 | Skinned or boned... kg... | | 20% | Free (A+, AU, BH, CA, CL, CO, D, E, IL, JO, MA, MX, OM, P, PA, PE, SG) 2% (KR) | 30% |
| | | Other: | | | | |
| 1604.13.40 | 00 | In immediate containers weighing with their contents under 225 grams each... kg... | | Free | | 25% |
| 1604.13.90 | 00 | Other... kg... | | 3.1% | Free (A*, AU, BH, CA, CL, CO, D, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 25% |
| 1604.14 | | Tunas, skipjack and bonito (Sarda app.): Tunas and skipjack: In airtight containers: | | | | |
| 1604.14.10 | | In oil... | | 35% | Free (A+, AU, BH, CA, CL, D, IL, JO, MA, MX, OM, P, PA, PE, R, SG) 3.5% (CO) 7% (KR) | 45% |

HTSUS 1604 (emphasis added).  Accordingly, subheading 1604.14.10, which carries a 35% *ad valorem* duty, covers:

> Prepared or preserved fish; caviar and caviar sub-stitutes prepared from fish eggs:
>> Fish, whole or in pieces, but ***not minced***:
>>> Tunas, skipjack and bonito (<u>Sarda</u> spp.):
>>>> Tunas and skipjack:
>>>>> In airtight containers:
>>>>>> ***In oil***.

HTSUS 1604.14.10 (emphases added).

StarKist seeks a classification under 1604.20.05, which covers "products containing meat of crustaceans, molluscs or other aquatic invertebrates; prepared meals," and

carries a 10% *ad valorem* duty. Appellant's Br. 22–42. Or, in the alternative, StarKist seeks a classification under either subheading 1604.14.22, which covers tuna that is "not minced" and "not in oil," carrying a 6% *ad valorem* duty, or subheading 1604.14.30, which covers "other," carrying a 12.5% *ad valorem* duty. *Id.* at 42–58.

StarKist timely filed two separate Customs protests challenging the classification of the tuna salad products under subheading 1604.14.10. Customs denied both protests. StarKist paid all applicable duties owed on the imports and filed this action in the United States Court of International Trade challenging the classifications. The Court of International Trade granted summary judgment in favor of the government, concluding that the tuna salad products are properly classified under 1604.14.10 because they are "not minced" and "in oil."

The term "minced" is not defined under the HTSUS. Accordingly, the Court of International Trade analyzed different factors to interpret the meaning of the term. J.A. 15. The Court of International Trade determined that a proper understanding of the term requires considering: "(1) whether the pieces, based on their size and physical characteristics, collectively, should be considered 'minced,' and, (2) whether the tuna pieces are the product of a minced cut." J.A. 15. Based on these factors, the Court of International Trade interpreted "minced" under heading 1604 to require "small pieces of a minced cut [that] are the product of a purposeful process that involves cutting or chopping." J.A. 19.

The Court of International Trade first determined that the size and physical characteristics of the pieces collectively are such that the tuna salad products are "not minced." J.A. 17–18. The Court of International Trade reasoned that "the presence of certain tuna pieces equivalent in size to minced tuna is purely incidental; the defining

character is more accurately described as chunky, with pieces of varying size." J.A. 17.

The Court of International Trade also determined that the tuna salad products are produced through a process distinct from mincing. J.A. 18–20. The Court of International Trade observed that the fish is first passed through a chopper with four blades, producing pieces of fish larger than Customs' proposed definition of "minced." J.A. 19–20. Then, these pieces are hand-folded with the other ingredients, breaking up some of the larger pieces. *Id.* The Court of International Trade reasoned that because the very small pieces in the tuna salad are produced by hand-blending rather than chopping, the subject merchandise is not the product of a minced cut. The Court of International Trade concluded that the products are "not minced" both in result and in process and, as such, are properly classified as "not minced." J.A. 20.

The Court of International Trade then determined that the tuna salad products are also properly classified as "in oil." J.A. 20–27. The Court of International Trade reasoned that because the oil is added after the fish is cooked but before it is packed, the StarKist products have been properly classified as "in oil" pursuant to HTSUS Chapter 16 Additional U.S. Note 1. J.A. 27.

StarKist timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

STANDARD OF REVIEW

We review de novo the Court of International Trade's decision to grant summary judgment and apply anew the standard used by the Court of International Trade to assess the subject Customs classification. *See Otter Prods., LLC v. United States*, 834 F.3d 1369, 1374–75 (Fed. Cir. 2016). "Although we review the decision[ ] of the CIT de novo, we give great weight to the informed opinion of the CIT . . . and it is nearly always the starting point of our

analysis." *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1341 (Fed. Cir. 2016) (internal quotation marks, brackets, and citation omitted). The Court of International Trade "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." U.S. CIT R. 56(a) (2015).

Proper classification of goods under the HTSUS is a two-step process. *Sigma-Tau HealthScience, Inc. v. United States*, 838 F.3d 1272, 1276 (Fed. Cir. 2016). First, we ascertain the meaning of the specific terms in the tariff provision. *Orlando Food Corp.*, 140 F.3d at 1439. Absent contrary legislative intent, we construe HTSUS terms according to their common and commercial meanings, which we presume to be the same. *Carl Zeiss*, 195 F.3d at 1379. To assist it in ascertaining the common meaning of a tariff term, the court may rely upon the term's ordinary meaning, lexicographic and scientific authorities, dictionaries, and other reliable information sources. *Brookside Veneers, Ltd. v. United States*, 847 F.2d 786, 789 (Fed. Cir. 1988). Second, we determine whether the goods come within the description of those terms. *Victoria's Secret Direct, LLC v. United States*, 769 F.3d 1102, 1106 (Fed. Cir. 2014). This step is a factual inquiry that we review for clear error. *Id.* When there is no factual dispute regarding the nature, structure, and use of imported merchandise, the proper classification turns on the first step. *Faus Grp., Inc. v. United States*, 581 F.3d 1369, 1372 (Fed. Cir. 2009).

## "NOT MINCED"

Pursuant to the GRIs, the question of whether the products at issue are "not minced" is a threshold question. StarKist contends that Customs and the Court of International Trade erred in interpretating the term "minced" and/or clearly erred in concluding that StarKist's products are "not minced." Appellant's Br. 25–31. We disagree.

First, we address the proper interpretation of the term "minced." Based on the record dictionary definitions, the language and context of the relevant subheadings, as well as the term's ordinary meaning, we conclude that when used in the context of imported fish, the common and commercial meaning of the term "minced" at least requires separation into very small pieces.[1]

Next, we must assess whether Customs clearly erred in its determination that the subject tuna salad products are "not minced." We find no such error. StarKist's tuna salad products at issue are not separated into very small pieces. Instead, the products are first roughly chopped, then hand-folded with additional ingredients, which results in a product consisting of some very small pieces and some chunks. J.A. 55, 60–61. More specifically, cooked albacore tuna is chopped by machine into 0.8–1.0 inch chunks, and cooked chunk light tuna is chopped by machine into 1.0–1.5 inch chunks. J.A. 45, 47–53, 55–56, 60–61, 65. Then, a person hand-folds the tuna pieces with the prepared mayonnaise-based dressing, breaking up some of these larger pieces. J.A. 48, 50, 56, 61. As the Court of International Trade recognized, at the end of this process, the products are properly described as chunky, with pieces of varying size. J.A. 18. This determination is supported by substantial evidence, including sworn testimony and laboratory reports. Accordingly, we determine that Customs did not clearly err in determining that the subject tuna salad products fall within the meaning of the term "not

---

[1] Because, as explained below, Customs did not clearly err in determining that the subject tuna salad products do not satisfy this requirement, we do not reach whether the pieces must be "the product of a purposeful process that involves cutting or chopping" to qualify as "minced." J.A. 19.

minced."   Next, we turn to whether the products are properly classified as "in oil."

### "IN OIL"

StarKist contends that its products are not properly classified as "in oil" because HTSUS Chapter 16 requires classification of tuna products as "in oil" only where the oil was added for purposes of packing—i.e., at the "packing stage." Appellant's Br. 42–58 (citing J.A. 56, 61, 593, 599). StarKist further contends that because the oil in its products is added during the preparation stage, and not the packing stage, its products are properly classified as "not in oil." *Id.*

HTSUS Chapter 16 Additional U.S. Note 1 governs this inquiry.  Note 1 states:

> For the purposes of this chapter, the term "in oil" means packed in oil or fat, or in added oil or fat and other substances, whether such oil or fat was introduced ***at the time of packing or prior thereto***.

HTSUS Chapter 16 Additional U.S. Note 1 (second emphasis added).  This statutory authority explicitly states that for the term "in oil" to apply, it matters not whether the oil was added during preparation or in the packing process.

StarKist cites two cases in support of its contention that Note 1 does not settle this issue in the government's favor: *Del Monte Corp. v. United States*, 730 F.3d 1352 (Fed. Cir. 2013), and *Richter Bros., Inc. v. United States*, 44 C.C.P.A. 128 (1957).

*Del Monte* involves the tariff classification of StarKist's "Tuna Fillets" products—cooked tuna products packaged in airtight foil pouches consisting of chunks of cooked albacore and yellowfin tuna marinated with a mixture of flavoring ingredients in a viscous sauce. 730 F.3d at 1355.  In contrast with this case, in *Del Monte*, the tuna was placed in the packaging first, then a sauce containing oil was

added.  *Id.*  This court determined that those StarKist products are "packed in oil" within HTSUS Chapter 16.  *Id.*

In *Richter*, the product at issue was herring that was cleaned, covered with wheat meal, put on sieves, and then fried in a pan.  44 C.C.P.A. at 131.  The frying fat consisted of 50% herring oil and 50% tallow.  *Id.*  After frying, the herring was cooled, and as much as possible of the remaining oil was drained off.  *Id.*  After cooling, the herring was packed into tins filled with a brine of wine, vinegar, water, sugar, and salt.  *Id.*  It was undisputed that some of the oil remained in the tins as a result of the frying process, but no oil, nor any ingredient containing oil, was added to the tins during packing.  *Id.*  Our predecessor court held that these products were not "packed in oil" under a different tariff schedule.  *Id.*

StarKist contends that its tuna salad products are not "packed in oil" because they are prepared in a similar fashion to the products in *Richter*.  StarKist argues that, under *Del Monte*, the oil must be added after the fish is already in the package to be considered "packed in oil."  Contrary to StarKist's contention, Note 1 resolves this dispute by clarifying that "in oil" is meant within Chapter 16 to distinguish products that incidentally contain oil as a result of their preparation, as was the case in *Richter*, from those in which oil is separately added, as is the case here and in *Del Monte*.  Accordingly, we determine that the tuna salad products are properly classified as "in oil" under subheading 1604.14.10 because the oil in the tuna salad products was introduced to the fish prior to packing and the oil is not merely incidental to the preparation, as described in Note 1.

## CONCLUSION

We hold that the tuna salad products at issue are properly classified under subheading 1604.14.10 of the HTSUS because they are "not minced" and are "in oil."  We have considered the parties remaining arguments and find

them unpersuasive.  Accordingly, we affirm the judgment of the Court of International Trade.

**AFFIRMED**